# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| **Terry L. Telin,** | Civ. No. 11-3129 (ADM/AJB) |
| Plaintiff, | |
| | **REPORT AND RECOMMENDATION** |
| **v.** | |
| **Michael J. Astrue,**<br>**Commissioner of Social Security**, | |
| Defendant. | |

_____

Ethel Schaen, Esq., 1821 University Avenue West, Suite 344, Saint Paul, MN 55104, and Jessica L. Fleming, Esq., 2000-A Southbridge Parkway, Suite 210, Birmingham, AL 35209, for Plaintiff.

David W. Fuller, Asst. United States Attorney, 600 United States Courthouse, 300 South 4th Street, Minneapolis, MN 55415, for the Commissioner.
_____

ARTHUR J. BOYLAN, United States Chief Magistrate Judge

The matter is before this Court, United States Chief Magistrate Judge Arthur J. Boylan, for a report and recommendation to the District Court on the parties' cross-motions for summary judgment. *See* 28 U.S.C. § 636(b)(1) and Local Rule 72.1. This Court has jurisdiction under 42 U.S.C. § 405(g). Based on the reasoning set forth below, this Court recommends that Plaintiff's motion for summary judgment [Docket No. 10] be denied and Defendant's motion for summary judgment [Docket No. 13] be granted.

1

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Procedural History

Plaintiff filed an application for disability insurance benefits ("DIB") on January 24, 2008, alleging disability beginning May 21, 2007, based on bipolar disorder, depression, hepatitis A, bad knees and liver, back problems and prior shoulder surgery.  (Tr. 115-17, 150.)[1]  His application was denied initially and upon reconsideration.  (*Id.* at 63-67, 72-74.) Plaintiff requested a hearing before an administrative law judge, and the hearing was held on March 23, 2010, before Administrative Law Judge ("ALJ") Larry Meuwissen.  (*Id.* at 75-76, 34-53.)  The ALJ issued an unfavorable decision on July 16, 2010.  (*Id.* at 15-33.)  On August 5, 2011, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (*Id.* at 1-3), making the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981.  On October 21, 2011, Plaintiff sought review from this Court.  The parties then filed cross-motions for summary judgment.

### B.    Factual Background

Plaintiff saw Dr. Jeffrey Elbers for a medication check on May 21, 2007, the day of his alleged onset of disability.  (Tr. 247-48.)  He complained of insomnia for the past six months, with daytime fatigue, stress, and difficulty concentrating at work.  (*Id.* at 247.) Plaintiff scored 25 on the PHQ-9,[2] indicating severe depression.  (*Id.*)  On examination, his

---

[1] The Court will cite the Administrative Record in this matter, Docket No. 9, as "Tr."

[2] The PHQ-9 is a self-administered Personal Health Questionnaire Depression Scale, consisting of nine questions.  Scores of 20 or more indicate severe major depression. Scores of 15 or greater indicate major depression.  PHQ-9, available at http://patienteducation.stanford.edu/research/phq.pdf

affect was flat; and he appeared fatigued. (*Id.*) His behavior, insight, judgment, speech and eye contact were normal. (*Id.*) He was oriented; and his thought process was coherent. (*Id.*) Plaintiff was 70.25 inches tall and weighed 317 pounds. (*Id.*) Dr. Elbers diagnosed depressive disorder, severe and benign hypertension. (*Id.* at 248.) He continued Plaintiff on Cymbalta, discontinued Lunesta, and started Elavil. (*Id.*) Dr. Elbers excused Plaintiff from work for two weeks. (*Id.*)

At the end of two weeks, Plaintiff said his medications were not helping much; and he was worried about losing his job. (*Id.* at 245.) Plaintiff's weight had increased to 319 pounds; he was sad and tearful; his insight and judgment were appropriate, speech and eye contact were normal; he was oriented, and his thought process was coherent. (*Id.*) Dr. Elbers diagnosed major depressive disorder, recurrent and insomnia disorder related to another mental disorder. (*Id.*) Dr. Elbers increased Plaintiff's Cymbalta and Elavil and recommended referral to psychiatry, which Plaintiff declined at that time. (*Id.*) Plaintiff also declined inpatient treatment. (*Id.*) Dr. Elbers noted Plaintiff had no suicide plan and no history of suicide attempts. (*Id.*) Later that month, Plaintiff's anxiety improved but he was not sleeping well. (*Id.* at 243.) Plaintiff denied stress or suicidal ideation. (*Id.*) His mental status examination was normal with the exception of anxious mood. (*Id.*) Dr. Elbers discontinued Elavil and prescribed Benadryl for insomnia. (*Id.*)

On July 20, 2007, Plaintiff continued on short-term disability from work. (*Id.* at 241.) Plaintiff's weight had increased to 321 pounds. (*Id.*) Plaintiff's severe depression, as measured on the PHQ-9, was unchanged. (*Id.*) Plaintiff admitted suicidal ideation but without intent. (*Id.*) His mood was depressed, but his anxiety improved. (*Id.*) His only medication side effect was dry mouth. (*Id.*) Dr. Elbers increased Cymbalta and started

Plaintiff on Ambien.  (*Id.*)  One month later, Plaintiff said he had not improved; and he needed disability paperwork completed.  (*Id.* at 239.)  Plaintiff's symptoms were depression, anxiety, high stress level, sleep disturbance, suicidal ideation, decreased appetite, low energy and poor concentration.  (*Id.*)  On mental status examination, he was sad, tearful and anxious, but his insight, judgment, speech, eye contact, thought process and orientation were normal.  (*Id.*)  Dr. Elbers decreased Cymbalta and started Zyprexa.  (*Id.*)  He also referred Plaintiff to a psychiatrist.  (*Id.*)  Dr. Elbers wrote Plaintiff a note to be off work for a month "at least".  (*Id.*)

Plaintiff was evaluated by Psychiatrist Ivan Sletten on August 23, 2007; and he . told Dr. Sletten he had a temper but controlled it fairly well.  (*Id.* at 456.)  He was depressed but would not go to a hospital, because it was like a prison.  (*Id.*)  Plaintiff said he could smile one minute and feel suicidal the next.  (*Id.*)  Plaintiff had been sober for fifteen years, and had a history of substance abuse.  (*Id.*)  He spent two years in prison for burglary.  (*Id.*)  Plaintiff said he tried to commit suicide with carbon monoxide six months earlier.  (*Id.*)  There were suicides in Plaintiff's family.  (*Id.*)  Plaintiff had been on medication for depression for three years.  (*Id.*)  Dr. Sletten noted Plaintiff seemed desperate.  (*Id.*)  He diagnosed mood disorder, NOS, assessed a GAF score of 50,[3] and started Plaintiff on Abilify, Seroquel and clonazepam.  (*Id.*)

Five days later, Plaintiff told Dr. Sletten "I still snap" and "I don't feel like doing

---

[3] The Global Assessment of Functioning Scale ("GAF"), a scale of 0 to 100, is used by mental health clinicians to subjectively rate the social, occupational and psychological functioning of their clients.  *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-tr*") 32 (American Psychiatric Association 4th ed. text revision 2000).  Scores of 41 to 50 indicate serious symptoms or any serious impairment in social, occupational or school functioning.  *Id.* at 34.

[anything]." (*Id.* at 263.) He reported having some "weird" feelings on Seroquel. (*Id.*) At the end of the month, Plaintiff said he was not suicidal, but he could not stand people and was applying for disability. (*Id.* at 262.) On September 6, 2007, Dr. Sletten noted Plaintiff slept six to eight hours and was less desperate but felt useless. (*Id.* at 261.) On September 11, 2007, Plaintiff saw Dr. Elbers who noted, "seeing counselor and will be out of work due to bipolar diagnosis and this relieves a lot of his stress." (*Id.* at 237.) On mental status examination, Plaintiff's depression was much better. (*Id.*) Dr. Elbers wrote "Dr Ivan Sletten managing// no work ability for next 3 months and likely long term." (*Id.*)

At the end of September, Dr. Sletten noted Plaintiff was slightly better and working on fixing his house. (*Id.* at 259.) Plaintiff's energy had increased; and he denied sleep disturbance, appetite change, medication side effects, and anxiety but complained of fatigue. (*Id.* at 235.) When Plaintiff saw Dr. Elbers, his mental status examination was normal. (*Id.*) Dr. Elbers described Plaintiff's mood and affect as pleasant. (*Id.*)

Two weeks later, Dr. Sletten completed the Guardian Life Insurance Company's form "Ongoing Psychiatric Physician Assessment." (*Id.* at 256-57.) He diagnosed Plaintiff with bipolar, NOS; obesity; and assessed a GAF score of 50.[4] (*Id.* at 256.) Under the headings "objective observations" and "subjective complaints," Dr. Sletten wrote the same comments, "can't be around people, mood swings, angry outbursts, spells of profound depression [with] suicidal ideas." (*Id.*) Dr. Sletten opined Plaintiff would be unable to return to any occupation, but eventually might work within a protected setting with few people around. (*Id.* at 257.) Dr. Sletten also checked a box on the form indicating "is unable to

---

[4] GAF scores between 51-60 indicate moderate symptoms or moderate difficulty in social, occupational or school functioning. *DSM-IV-tr* at 34.

5

engage in stress situations or engage in interpersonal relationships." (*Id.*) On October 23, 2007, Plaintiff told Dr. Sletten that he had a good vacation. (*Id.* at 276.) He was still anxious around people but did not have suicidal thoughts. (*Id.*) Plaintiff also said that Adderall kept him from obsessing and helped him stay active. (*Id.*)

At the end of November 2007, Dr. Elbers tested Plaintiff's lithium level at Dr. Sletten's request. (*Id.* at 232.) Plaintiff complained of decreased appetite, motivation, energy level, and fatigue. (*Id.*) He denied the following: anxiety, high stress level, being sad or crying easily, anger, thoughts of hurting himself, memory problems or confusion. (*Id.*) Plaintiff's weight was 296; and his weight loss was intentional through dieting. (*Id.* at 232-33.) Apart from flat affect, Plaintiff's mental status examination was normal. (*Id.* at 233.) Dr. Elbers diagnosed bipolar disorder. (*Id.*)

In December 2007, Dr. Sletten completed a "Mental Residual Functional Capacity Questionnaire" regarding Plaintiff. (*Id.* at 267-69.) He rated Plaintiff as having "marked" or "severe" difficulties in the following things: maintaining social functioning, responding appropriately to supervision, and responding appropriately to co-workers. (*Id.*) He rated Plaintiff as having moderate difficulties with the following: concentration, persistence or pace resulting in failure to complete tasks in a timely or appropriate manner; understanding, remembering and carrying out instructions; responding appropriately to customary work pressures; performing complex or detailed tasks; and performing simple tasks. (*Id.*) Dr. Sletten indicated Plaintiff had mild difficulty in performing repetitive tasks. (*Id.* at 269.) He also opined Plaintiff would have four or more episodes of decompensation that would cause him to withdraw from the situation or experience exacerbation of signs or symptoms. (*Id.* at 268.) Dr. Sletten expected these limitations to last more than twelve months, and opined

Plaintiff's limitations began "years ago." (*Id.* at 269.) The limitations would also result in the failure to complete tasks in a timely manner in an 8-hour day on a chronic basis, and result in failure to attend work in excess of 25 days per year. (*Id.*)

Plaintiff called the SSA on March 3, 2008 to cancel his physical consultative examination. (Tr. 347.) Plaintiff said he did not have physically disabling conditions; it was bipolar disorder and depression that prevented him from working. (*Id.*)

On March 18, 2008, Dr. Sletten completed the form "Psychological Medical Report," noting he saw Plaintiff monthly since August 23, 2007. (*Id.* at 295.) He opined that Plaintiff had "years of borderline functioning [and] limited work performance - inability to work around other people - he gets extremely tense, anxious [and] often angry around people. He blows up at his boss repeatedly [and] was finally let go from his job." (*Id.*) Under "mental status," Dr. Sletten wrote "tense, [illegible], depressed, angry, fearful and suspicious." (*Id.*) Under "general observations, Dr. Sletten wrote, "poorly groomed, often unshaven, sloppy clothes, obesity." (*Id.*) He also noted that Plaintiff was angry with his wife over a brief affair and wanted to harm her partner. (*Id.*) Plaintiff's interests were staying out of prison "where he was years ago" and doing some handy work. (*Id.*) Plaintiff could not tolerate others. (*Id.*)

Dr. Sletten opined Plaintiff had "totally persistent fears of people." (*Id.* at 296.) If there were no people around, Plaintiff could persist at routine tasks. (*Id.*) Plaintiff was "too severely disturbed" to try another job. (*Id.*) Dr. Sletten diagnosed bipolar disorder and opined Plaintiff's prognosis was "nonexistent for recovery." (*Id.*) He did not believe Plaintiff could manage benefits in his own interest. (*Id.*)

Later that month, Plaintiff underwent a consultative psychological examination with

Dr. Dustin Warner.  (*Id.* at 317-21.)  Plaintiff told Dr. Warner he had a bout of depression and problems with forgetfulness.  (*Id.* at 317.)  Plaintiff said he attempted suicide one year ago, but he would not let anyone admit him to a psychiatric facility.  (*Id.* at 318.)  He had crying spells and was socially withdrawn.  (*Id.*)  Plaintiff described two incidents where he had to leave a place because he felt anxious, which he described as feeling nauseous.  (*Id.*)  Plaintiff had a history of chemical dependency but was sober over twenty years.  (*Id.*)  He had a ninth grade education and never completed a GED.  (*Id.*)  Plaintiff estimated that he had a third grade reading level.  (*Id.*)  He was in prison from 1979 through 1982.  (*Id.* at 318-19.)  He was currently on medical leave from his job as a janitor.  (*Id.* at 318.)

Plaintiff described his daily activities.  (*Id.* at 319.)  He lived with his wife and thirteen-year-old granddaughter.  (*Id.*)  He went to bed at 11:00 p.m. and woke up at 7:30 a.m.  (*Id.*)  He showered once a week and did not eat breakfast.  (*Id.*)  He ate lunch sporadically and dinner consistently.  (*Id.*)  He spent his time cleaning the house and making supper.  (*Id.*)  He denied brushing his teeth, going to church, having hobbies, and having friends.  (*Id.*)  Plaintiff said he did not get along with other people.  (*Id.*)

On mental status examination, Plaintiff was alert, oriented and cooperative, gave adequate eye contact, speech was clear and goal-directed, thought processes and content were intact, stream of consciousness was clear and reality based.  (*Id.*)  Plaintiff was situationally anxious and depressed, with restricted affect.  (*Id.*)  His depressive symptoms included despondency, anhedonia, appetite suppression, sleep disruption, low energy, feelings of worthlessness, poor concentration, crying spells, social withdrawal, and past suicidal thoughts.  (*Id.*)  Plaintiff could recall five digits forward and three backward.  (*Id.*)  He recalled one of three objects after five and thirty minute delays.  (*Id.*)  He could count

backward from twenty to one but could not count serial 7s or 3s. (*Id.*) He could perform basic but not complex math equations. (*Id.* at 320.) Plaintiff provided good interpretations of abstract proverbs. (*Id.*) He knew the current president and four of five past presidents. (*Id.*) His word association skills were somewhat below average. (*Id.*) His insight and judgment were fair, and recent and remote memory appeared intact. (*Id.*) Plaintiff's estimated level of intelligence was low average. (*Id.*) He did not present with a personality or pain disorder. (*Id.*)

Dr. Warner found that Plaintiff did not meet the criteria for bipolar disorder. (*Id.*) Instead, he diagnosed major depressive disorder and anxiety disorder, NOS, with a GAF score of 51. (*Id.*) He opined that Plaintiff could understand, remember and follow simple instructions; sustain attention and concentration to carry out routine, repetitive work with reasonable persistence and pace; respond appropriately to co-workers on a brief and superficial basis; and tolerate minimal stress and pressure in an entry-level workplace. (*Id.* at 321.)

On April 8, 2008, Dr. Janis Konke, a state agency consulting psychologist, reviewed Plaintiff's social security disability file and completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form regarding Plaintiff, at the request of the SSA. (*Id.* at 326-43.) Dr. Konke opined Plaintiff had affective and anxiety-related disorders that caused moderate restriction in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in concentration, persistence or pace. (*Id.* at 326, 336.) Dr. Konke opined Plaintiff could do the following: concentrate on, understand, remember and carry out routine, repetitive instructions and tasks; handle brief, superficial, infrequent contact with co-workers, with no public contact;

9

adequately handle routine stresses of a routine, repetitive work setting; and handle ordinary levels of supervision found in a customary work setting. (*Id.* at 342.)

Dr. Konke noted many of Dr. Sletten's conclusions seemed to flow from Plaintiff's reports, not Dr. Sletten's observations, and it was not apparent that Dr. Sletten observed Plaintiff being angry, suspicious, and unable to control himself. (*Id.* at 338.) Dr. Konke opined that Plaintiff's depression was fairly consistently at a moderate level. (*Id.*) Dr. Sletten seemed to think Plaintiff's major problem was anger, especially toward the man with whom his wife had an affair. (*Id.*) Although Plaintiff had a past history of prison time, Dr. Konke noted there was no evidence of rage or anger in his daily life. (*Id.*) Contrary to Dr. Sletten's portrayal of Plaintiff, Dr. Konke noted the consultative examiner ("CE") described Plaintiff as cooperative, with restricted affect and moderately depressed mood. (Tr. 342.) Plaintiff alleged poor memory and a third-grade reading level, but the CE estimated his intellectual functioning as low average and noted Plaintiff's memory appeared to be grossly intact. (*Id.*) Dr. Konke also noted that she contacted Dr. Sletten for more information, but Dr. Sletten refused to do anything other than respond to written questions. (*Id.* at 338.) Dr. Sharon Frederiksen reviewed Plaintiff's social security disability file on July 8, 2008, and affirmed Dr. Konke's opinion. (*Id.* at 372-74.)

On April 15, 2008, Plaintiff told Dr. Sletten he felt the best he had in a long time. (*Id.* at 306.) However the next month, Plaintiff was depressed, easily irritated, slept a lot, but was not thinking about suicide. (*Id.* at 305.) Plaintiff then saw Dr. Elbers on May 15, 2008. (*Id.* at 352-54.) Dr. Elbers wrote, "still sees psychiatry and counseling with some success but not great right now." (*Id.* at 352.) Plaintiff denied fatigue. (*Id.*) He appeared depressed, but his mental status was otherwise normal. (*Id.* at 353.) His weight was down

to 278 pounds.  (*Id.*)

Plaintiff was anxious and felt like crying when he saw Dr. Sletten on June 9, 2008. (*Id.* at 304.)  He could only sleep by taking Seroquel.  (*Id.*)  A month later, Plaintiff was crying and argumentative.  (*Id.* at 303.)  Dr. Sletten wrote, "thoughts of hurting self to get SSD" and "[r]efuses IP[5] care 'It's like a prison.'"  (*Id.*)  Dr. Sletten wrote that Plaintiff purposefully hurt his knee in "04 & 05" to get out of work.  (*Id.*)  Later that month, Plaintiff told Dr. Sletten he did not know when he would "blow up."  (*Id.* at 302.)  Nonetheless, Plaintiff felt better and like his old self, but a bit irritable.  (*Id.*)  Dr. Sletten completed another disability form for Plaintiff on August 15, 2008, indicating that Plaintiff was not capable of returning to any job.  (*Id.* at 449.)  He stated that Plaintiff was too anxious, explosive and unpredictable.  (*Id.*)

Months later, on January 23, 2009, Dr. Sletten assessed Plaintiff with a GAF score of 55, with 65 as his highest score in the past year.[6]  (*Id.* at 448.)  During a routine physical examination with Dr. Elbers on January 26, 2009, Plaintiff denied fatigue and anxiety.  (*Id.* at 397-98.)  His weight was down to 252 pounds.  (*Id.* at 398.)  On the same day, Dr. Sletten completed another disability form for Plaintiff, checking a box to indicate "patient has significant loss of psychological, physiological, personal, and social adjustment (severe limitations)."  (*Id.* at 447.)  Then, in a treatment record dated April 16, 2009, Dr. Sletten noted Plaintiff "took a bunch of Seroquel and Lithium" since his last visit, and then slept for three days.  (*Id.* at 445.)  When he woke up, he felt better.  (*Id.*)  Plaintiff's mood seemed

---

[5] In context, the Court assumes "IP" stands for inpatient.

[6] GAF scores between 61 and 70 indicate some mild symptoms or some difficulty in social occupational or school functioning, but generally functioning pretty well.  *DSM-IV-tr* at 34.

better.  (*Id.*)  He was working on his house and yard and helping neighbors.  (*Id.*)  Dr. Sletten did not think Plaintiff was a suicide risk.  (*Id.*)  His medications at that time were lithium, Adderall, Seroquel, Prozac, Abilify, Haldol, Wellbutrin, and Valium.  (*Id.*)  Plaintiff was also in a better mood on May 14, 2009.  (*Id.* at 444.)  He had taken a "mini-vacation" with his wife, spending some time in a small town.  (*Id.*)

On June 15, 2009, Plaintiff told Dr. Sletten he had a fight with his wife because she was angry that he had some friends over working on a chain saw in the driveway.  (*Id.* at 443.)  As a result, Plaintiff was living in his truck.  (*Id.*)  He denied thoughts of hurting himself or others.  (*Id.*)  Plaintiff said if he did not have Adderall, he would "blow up."  (*Id.*)  Plaintiff was impulsive, but Dr. Sletten did not see a reason to hospitalize him at that time.  (*Id.*)  Dr. Sletten diagnosed mood disorder, NOS.  (*Id.*)  Two weeks later, Plaintiff was back in his house and felt a little more hopeful.  (*Id.* at 442.)  Plaintiff had an obsession about his wife having an affair, and Dr. Sletten recommended shock treatment, but Plaintiff was not interested.  (*Id.*)  Plaintiff continued to refuse to be hospitalized, and Dr. Sletten did not initiate involuntary hospitalization because he did not think Plaintiff was a threat to himself or others.  (*Id.*)  Plaintiff was sleeping every night and taking care of his house and yard. (*Id.*)

Dr. Sletten completed another form for Plaintiff's disability insurance company in July 2009.  (*Id.* at 440-41.)  He indicated that Plaintiff was totally incapacitated from any type of work for an indeterminate period of time; and his condition worsened in the last three months.  (*Id.* at 440.)  Dr. Sletten explained that Plaintiff could not stand people, crowds, or his irritation with others.  (*Id.* at 441.)  Plaintiff obsessed about his wife having an affair, which caused him to threaten suicide or to hurt others.  (*Id.*)  At the end of the July,

however, Dr. Sletten noted Plaintiff had a good month. (*Id.* at 439.) He slept during the day and worked around the house at night. (*Id.*) He was getting along with his wife. (*Id.*) Plaintiff seemed under reasonable control but still had pent up anger, depression and hostility "for which he needs medication." (*Id.*) But in August, Plaintiff and his wife were planning on separating. (*Id.* at 438.) Plaintiff said he was up at night "when there are no people around." (*Id.*) He also said Adderall helped him stay calm. (*Id.*) He had thoughts of suicide at times but did not have a plan. (*Id.*) Plaintiff again refused hospitalization or a residential program. (*Id.*)

In September, Plaintiff's wife remained with him, and he was more relaxed and doing more around the house. (*Id.* at 437.) On a positive note, Plaintiff agreed to go to the State Fair with his wife. (*Id.*) Plaintiff told Dr. Sletten he might agree to shock treatment if his wife left him. (*Id.*) Dr. Sletten recommended that Plaintiff spend more time staying busy with his brother. (*Id.*) In October, Plaintiff was still living with his wife, working around his house, and occasionally helping his brother build his house. (*Id.* at 436.) But Plaintiff wanted to start shock treatment because he could not get his wife's affair out of his mind. (*Id.*) Plaintiff was depressed and anxious but did not appear as irritable and short as usual. (*Id.*) Dr. Sletten described Plaintiff as "very obsessive with a lot of smoldering anger." (*Id.*) Plaintiff said Adderall was the only thing that calmed him down. (*Id.*)

On October 29, 2009, Plaintiff looked sad and said he was living in his garage. (*Id.* at 430.) Plaintiff could not get his mind off his wife's affair, and he could not afford to start shock therapy. (*Id.*) However, he recently had a good time with his wife at the State Fair. (*Id.*) Plaintiff said he gathered scrap metals with a buddy from 5:00 a.m. to 10:00 a.m., then slept most of the day. (*Id.*) Dr. Sletten noted Plaintiff was morose, obsessive, worried

and opinionated.  (*Id.*)  Plaintiff still declined inpatient treatment.  (*Id.*)

About a month later, Plaintiff was very upset because he was losing his truck, and his wife was setting up a separate checking account.  (*Id.* at 435.)  Plaintiff would not be able to start his shock treatments unless his wife made the co-pays, and she said she could not afford it.  (*Id.*)  Plaintiff had not taken his Adderall or his blood pressure medicine, which he said he quit in hopes he would have a heart attack.  (*Id.*)  Dr. Sletten stated, "the patient presents as a distressed, rather pathetic, big, strong man thinking about ending it all but he is not quite ready to do it."  (*Id.*)  Dr. Sletten hoped to be able to set up shock treatments for Plaintiff.  (*Id.*)

Plaintiff's mood was a little brighter on December 1, 2009, after he reconciled somewhat with his wife and moved back in the house.  (*Id.* at 429.)  She was going to help him get a truck so he could continue to pick up scrap metal.  (*Id.*)  Plaintiff continued to feel that Adderall calmed him down.  (*Id.*)  Dr. Sletten believed Plaintiff was considerably better. (*Id.*)  He noted that Dr. Daniewicz confirmed Plaintiff had attention deficit disorder, justifying his use of Adderall.  (*Id.*)[7]  Plaintiff continued to do much better two weeks later.  (*Id.* at 428.)  He made a little money in scrap metal and was getting along fairly well with his wife. (*Id.*)

On January 5, 2010, Dr. Sletten completed a Mental Residual Functional Capacity Questionnaire regarding Plaintiff.  (*Id.* at 458-60.)  He indicated that Plaintiff was mildly restricted in activities of daily living; he had marked difficulties in maintaining social functioning; he had moderate deficiencies in concentration, persistence or pace; and

---

[7] There are no treatment records from Dr. Daniewicz in the administrative record.

Plaintiff had four or more episodes of decompensation in work or work-like settings. (*Id.* at 458-59.) Dr. Sletten also rated Plaintiff as having marked difficulties in responding appropriately to supervision and co-workers. (*Id.* at 459.) Plaintiff had moderate difficulty doing the following: 1) understanding and remembering instructions; 2) responding appropriately to customary work pressure; and 3) performing complex or detailed tasks. (*Id.*) Finally, he rated Plaintiff as having no difficulty performing simple or repetitive tasks. (*Id.* at 460.) Dr. Sletten checked "yes" before the following sentences:

> Based on my observation and treatment of this patient, I believe this patient will experience symptoms, on a chronic basis, from his/her underlying medical condition(s) which could reasonably be expected to cause distraction from job tasks, or result in a failure to complete job tasks in a timely manner, for more than two hours during a typical 8 hour workday.
>
> Based on my observation and treatment of this patient, I believe this patient could be expected to miss more than three days of work each month as a result of his/her underlying medical condition(s).

(Tr. 460.)

Later that monthm Plaintiff's mood was poor; and he had many problems. (*Id.* at 427.) He had a conflict with his partner in the scrapping business, and the scrapper owed him $600.00. (*Id.*) Plaintiff and his wife were not getting along. (*Id.*) He was also obsessed with the thought of dying because his brother died at his same age. (*Id.*) Dr. Sletten noted Plaintiff was smart when it came to working with his hands; and he believed Plaintiff could read, although he said he could not. (*Id.*) Plaintiff was very emotional but Dr. Sletten did not think he was suicidal. (*Id.*)

### C. Function Report and the Administrative Hearing

Plaintiff completed a function report for the SSA. (Tr. 181-88.) He described his

daily activities. He got dressed, picked up the house, watched television, stared out the window, smoked, and went to bed. (*Id.* at 181.) He had no problems with personal care. (*Id.* at 182.) He prepared his own simple meals. (*Id.* at 183.) He could also do laundry and housework. (*Id.*) He only left the house to see a doctor because he did not feel comfortable in crowds. (*Id.* at 184.) He used to enjoy biking and fishing but no longer did these things. (*Id.* at 185.) His impairments made it difficult for him to concentrate and understand and follow directions. (*Id.* at 186.) He did not handle stress well, hated changes and could not stand to be around a crowd of people. (*Id.* at 187.) Plaintiff indicated in his Work History Report to the SSA that he worked as a janitor for a float manufacturer from 1993 until 2007. (*Id.* at 170.)

At the hearing before the ALJ on September 15, 2010, Plaintiff testified as follows. He was six feet tall and weighed 249 pounds, which was down quite a bit from when he applied for disability. (*Id.* at 38.) Plaintiff's wife worked as the manager at a dental company, and they had three grown children and eight grandchildren whom they did not see often. (*Id.* at 38-39.) Plaintiff said he was not running a scrap metal business, he was just driving another person around because the person did not have a driver's license. (*Id.* at 39.) The other person loaded and emptied the truck. (*Id.*) The job lasted only a month-and-a-half. (*Id.* at 40.) Plaintiff's former job was in building maintenance. (*Id.*) Plaintiff left the job because he could not be around people anymore. (*Id.* at 41.) He was embarrassed about breaking down crying. (*Id.*) He did not know what brought this on. (*Id.*) He said he loved his job but was let go because the position was eliminated while he was on disability. (*Id.* at 46.) Plaintiff used to get private disability payments but the payments ended. (*Id.* at 41-42.) His truck and his wife's car were repossessed. (*Id.* at 42.)

Plaintiff used to enjoy working on cars and doing yard work.  (*Id.* at 43.)  He no longer had interest in it, but he mowed his lawn and painted the house.  (*Id.*)  Plaintiff took many medications but no longer took lithium.  (*Id.* at 44.)  He took Haldol for "aggression" but could not identify an incident that caused him to start Haldol.  (*Id.*)  He used to be happy and worked hard for sixteen years.  (*Id.*)  Plaintiff said he refused to go to a hospital or have shock treatment, although his wife tried to talk him into it.  (*Id.* at 47.)

Plaintiff explained that he could not concentrate because he had things running through his mind all the time.  (*Id.* at 47.)  On bad days, he wanted to kill himself.  (*Id.*)  He did not leave his house approximately five days per week.  (*Id.* at 47-48.)  He spent the days sitting in his garage.  (*Id.* at 48.)  He was trying to fix his vehicle for six months but he had trouble concentrating.  (*Id.* at 45.)  Plaintiff did not belong to groups because he did not like being around people.  (*Id.*)  He also had pain in his knees and shoulders.  (*Id.*)

Steven Bosch then testified as a vocational expert.  (*Id.* at 48, 229)  The ALJ posed a hypothetical question about work that could be performed by a 50-year-old person with a limited education, and the capacity for medium work limited to routine, repetitive instructions and tasks, brief and [in]frequent[8] superficial contact with co-workers and the public.  (*Id.* at 49.)  Bosch testified such a person could perform Plaintiff's past work as a janitor.  (*Id.*)  The ALJ asked whether a person who could not tolerate even brief and superficial contact with people could perform any jobs.  (*Id.*)  Bosch testified there were no jobs meeting those requirements.  (*Id.*)  Bosch also testified that if a person of the same

---

[8] The transcript says "frequent" but the Court assumes the ALJ said "infrequent" and there was a mistake in the transcription.  This would be consistent with the ALJ's RFC decision, which says "infrequent contact," and Dr. Konke's opinion, which the ALJ credited.  (Tr. 22, 342.)

age, education and work history as Plaintiff would miss in excess of three days work per month, it would preclude competitive employment. (*Id.* at 50.) The same was true if that person was distracted in excess of two hours in an eight-hour workday and could not complete tasks in a timely manner. (*Id.*)

      **D.**    **The ALJ's Decision**

On July 16, 2010, the ALJ issued his decision denying Plaintiff's application for DIB. (Tr. 15-33.) The ALJ followed the five-step sequential evaluation set forth in the agency's regulations. *See* 20 C.F.R. § 404.1520. The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her relevant past work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the ALJ "to prove that there are other jobs in the national economy that the claimant can perform." Fines v. Apfel, 149 F.3d 893, 894-95 (8th Cir. 1998).

At the first step of the evaluation process, the ALJ determined that the claimant had not engaged in substantial gainful activity since May 21, 2007, the alleged onset date. (Tr. 20.) Plaintiff had earnings in 2007, 2008, and 2009, from part-time work and private disability insurance payments. (*Id.*) His work activity, however, did not rise to the level of substantial gainful activity. (*Id.*) At the second step of the process, the ALJ found that

Plaintiff had severe impairments of affective disorder and anxiety disorder. (*Id.*) His physical impairments were nonsevere. (*Id.* at 20-21.)

At the third step of the evaluation, the ALJ determined that Plaintiff did not have an impairment or impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 21.) Plaintiff did not satisfy the "Paragraph B criteria" for Listings 12.04 or 12.06 because he did not have two of the following: marked restriction in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace, or repeated episodes of decompensation, each of extended duration. (*Id.*) Plaintiff had only moderate restrictions in activities of daily living because he could tend to his personal needs, drive a car, prepare simple meals, clean his house, do laundry, cut his lawn, paint the exterior of his house, and repair vehicles. (*Id.*) Plaintiff had only moderate difficulty in social functioning because he lived with his wife and granddaughter, went out by himself, attended a fair, took a mini-vacation with his wife in 2009, started a scrapping business with a partner, and helped his neighbors. (*Id.* at 22.) Plaintiff also had only moderate difficulties in concentration, persistence or pace because he watched television; and his psychiatrist said he was smart about doing things with his hands, such as car repair and electrical repairs. (*Id.*) The ALJ found Plaintiff experienced no episodes of decompensation because he was never hospitalized for psychiatric treatment. (*Id.*) He also found no evidence that Plaintiff met the "C criteria" of the listings. (*Id.*)

At the next step of the evaluation process, the ALJ determined that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels but with nonexertional limitations of routine, repetitive instructions and tasks; involving only brief,

infrequent, and superficial contact with co-workers and the public. (*Id.*) The ALJ gave the following reasons for his conclusion. Plaintiff's allegedly disabling impairments were present at approximately the same level of severity prior to his alleged onset date. (*Id.* at 23.) His depression preceded his alleged onset date by several years. (*Id.*) The fact that his impairments did not prevent him from working at that time, strongly suggested they did not currently prevent work. (*Id.*) There was no evidence of a significant exacerbation in his pre-existing mental health condition around his alleged disability onset date of May 21, 2007. (*Id.* at 24.) Just one month later, Dr. Elbers described Plaintiff as pleasant, cooperative, alert and oriented. (*Id.*) Soon after, his mental status was normal, and his depression was much better. (*Id.*)

The ALJ reviewed Dr. Warner's consultative examination record and noted it was Dr. Warner's opinion that Plaintiff was capable of working full-time "within the mental health parameters of the residual functional capacity." (*Id.*) The ALJ found that Plaintiff's treatment was generally successful in controlling his "allegedly disabling symptoms." (*Id.*) The ALJ cited evidence that Plaintiff felt slightly better in September 2007; he was busy fixing his house in October 2007; Adderall kept Plaintiff from obsessing; Plaintiff denied sadness and anxiety in November 2007; he felt better and less stressed in April 2008, and by April 2009, he was feeling good with a better mood. (*Id.*) In July 2009, Plaintiff said Adderall made him feel "easy-going," and he was more active. (*Id.* at 24-25.) By September 2009, Plaintiff appeared considerably more calm, and was more active around the house. (*Id.* at 25.) In late 2009, he was happy about having a job, and felt his medication did a lot of good. (*Id.*) Dr. Sletten concluded Plaintiff was doing considerably better. (*Id.*) The ALJ found that Plaintiff suffered no significant side effects from

medication.  (*Id.*)

Although Plaintiff's work activity after the alleged onset date did not qualify for substantial gainful activity, the ALJ found Plaintiff's daily activities were at times more than what he reported.  (*Id.*)  The ALJ also noted Plaintiff's criminal history may have been a non-medical barrier to his employment. (*Id.*) Plaintiff's receipt of employer-related disability income might have provided a financial incentive not to work.  (*Id.*)  The ALJ did not credit Plaintiff's description of his limited activities of daily living because they could not be objectively verified, and it was difficult to attribute the degree of limitation described with his medical condition, as opposed to other reasons. (*Id.*)  At the same time, some of Plaintiff's activities, such as caring for his personal needs, housework and repairs, car repairs, yard work, helping neighbors, driving, running a business, taking a mini-vacation and going to the State Fair were fully consistent with the RFC.  (*Id.*)

The ALJ gave the opinions of state agency consultants', Drs. Konke and Frederiksen, and the consultative examiner, Dr. Warner, significant probative weight because they were consistent with the  objective medical records.  (*Id.* at 26.)  However, the ALJ rejected the opinion that Plaintiff would be incapable of all public contact. (*Id.*)  The ALJ discounted Dr. Sletten's opinions because Plaintiff had the same limitations for years. (*Id.*)  And, Dr. Sletten said Plaintiff had four or more episodes of decompensation, although he was never hospitalized.  (*Id.*)  Dr. Sletten also made findings consistent with Plaintiff having only moderate limitations and symptoms, including a GAF score of 55.  (*Id.* at 26-27.)  The ALJ found Dr. Sletten's opinion that Plaintiff was "totally incapacitated from any type of work in any type of environment" obviously not true because Plaintiff was "working with a partner collecting scrap materials around that time." (*Id.* at 27.)  The ALJ found Dr.

Sletten's extreme findings to be markedly out of proportion to the objective evidence and his own treatment notes, showing improvement with treatment and medication. (*Id.*) The ALJ found that Plaintiff's mood improved when he was active and working. (*Id.*) The ALJ assumed Dr. Sletten relied heavily on Plaintiff's subjective reports, which were not reliable. (*Id.*)

Based on the VE's testimony, the ALJ concluded Plaintiff was capable of performing his past relevant work as a janitor. (*Id.*) Therefore, the ALJ determined Plaintiff was not under a disability, as defined in the Social Security Act, from May 21, 2007, through the date of the decision. (*Id.*) (citing 20 C.F.R. § 404.1420(f)).

## II.    DISCUSSION

### A.    <u>Standard of Review</u>

Review by this Court is limited to a determination of whether a decision of the ALJ is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Davidson v. Astrue*, 578 F.3d 838, 841 (8th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brace v. Astrue*, 578 F.3d 882, 884 (8th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted)). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Id.*

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The

Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (if supported by substantial evidence, the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.) Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin*, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability benefits. *See* 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she can not perform past work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial gainful activity. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

**B.** **Analysis**

Plaintiff raises three issues in support of his motion for summary judgment: 1) the ALJ failed to properly evaluate Drs. Elbers and Sletten's opinions; 2) the ALJ ignored Plaintiff's medically determinable diagnosis of obesity; and 3) the ALJ did not properly evaluate Plaintiff's subjective complaints. In response, the Commissioner asserts the following: 1) Dr. Elbers never opined Plaintiff was disabled for any continuous period of twelve months; 2) Dr. Sletten's opinions are not supported by objective clinical findings and were inconsistent with his own treatment notes; 3) the state agency physicians' opinions were properly granted more weight because they were well-supported and consistent with the overall record evidence; 4) Plaintiff provided no evidence that obesity caused or contributed to his depression; and 5) the ALJ applied the requisite two-pronged test when considering Plaintiff's credibility.

### 1.    Physicians' opinions

A claimant's residual functional capacity is what he can do despite his physical or mental impairments. *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003). "The ALJ should consider 'all the evidence in the record' in determining RFC, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004) (quoting *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (citing *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).   The RFC determination must be based on medical evidence that addresses the claimant's ability to function in the workplace. *Id.*

A treating physician's RFC opinion should be given controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005) (quoting *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (quotation omitted)).   "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

If the ALJ does not give the treating physician's opinion controlling weight, she should consider the following factors in weighing the medical opinions:   1) type of relationship with physician; 2) supportability of the opinion; 3) consistency of the opinion with the record as a whole; 4) specialization; and 5) any factors brought to the ALJ's attention. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)).

Plaintiff contends that Dr. Elbers' statement, "[Plaintiff] [w]ill be out of work due to

bipolar disorder"[9] is consistent with Dr. Sletten's disability opinions, and with Plaintiff's GAF scores of 50. Thus, Plaintiff concludes the ALJ erred by ignoring Dr. Elbers' opinion. Plaintiff further asserts that the ALJ failed to apply the appropriate factors, treatment history and specialization, entitling Dr. Sletten's opinion to greater weight. Finally, Plaintiff argues the ALJ erred by discounting Dr. Sletten's opinion based on a single GAF score and Plaintiff's failed attempt at part-time work.

Upon review of the record, Dr. Elbers never opined that Plaintiff's mental impairments were expected to prevent him from working twelve months or longer. Dr. Elbers had been treating Plaintiff for depression, and in August 2007, Dr. Elbers gave Plaintiff a work excuse for one month; and he referred Plaintiff to a psychiatrist for further treatment. (Tr. 239.) When Plaintiff saw Dr. Elbers the next month, Plaintiff was feeling much better because his psychiatrist would continue to keep him off work. (*Id.* at 237.) Dr. Elbers wrote, "Dr Ivan Sletten managing// no work ability for next 3 months and likely long term." (*Id.*) Moreover, even if Dr. Elbers' treatment records could be construed to contain an opinion that Plaintiff would be unable to work for twelve months or longer due to his mental impairments, an opinion that a claimant can not be gainfully employed is reserved to the Commissioner, and is not the type of medical opinion an ALJ must evaluate. *See Ellis*, 392 F.3d at 994 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004); 20 C.F.R. § 404.1527(e)(1)). The ALJ, therefore, did not err by failing to consider the

_____

[9] Plaintiff cited page 235 of the administrative record but the quote appears on page 237. (Pl's. Brief in Supp. of Mot. For Summ. J. at 5.) The full quote states "51 year old male presents with c/o PHQ9 given to fill out=21, improved, reviewed with patient, 20-27 severe depression - - seeing counselor and will be out of work due to bipolar diagnosis and this relieves a lot of his stress."

statement by Dr. Elbers.

Dr. Sletten, on the other hand, provided several opinions explaining that Plaintiff would be unable to work due to his mental impairments; and the ALJ gave a number of reasons for discounting Dr. Sletten's opinions. The ALJ reasoned: 1) Plaintiff was treated for depression but continued to work for three years before his alleged disability onset, without any evidence that his medical condition changed; 2) Plaintiff improved with counseling and medication and apparently had no side effects; 3) Plaintiff engaged in more activities than he described in his testimony, including helping neighbors, running a business, going to the State Fair, and going on vacation; and 4) Dr. Sletten assessed Plaintiff with a GAF score of 55, indicating only moderate symptoms or limitations. Plaintiff is, therefore, incorrect that the ALJ relied solely on one moderate GAF score and Plaintiff's attempt at part-time work in discounting Dr. Sletten's opinions.

In a December 2007 functional assessment, Dr. Sletten wrote that Plaintiff's work restrictions, the most severe of which related to social functioning and responding to people, began "years ago." (Tr. 267-69.) In a disability opinion of March 18, 2008, Dr. Sletten stated that Plaintiff had "years of borderline functioning [and] limited work performance - inability to work around other people - he gets extremely tense, anxious [and] often angry around people. He blows up at his boss repeatedly [and] was finally let go from his job." (*Id.* at 295.) However, Plaintiff testified that he was let go because his job was eliminated while he was on disability, not because he blew up at his boss. (*Id.* at 46.) He also testified that he loved his job but could no longer be around people because he cried easily. (*Id.*) As soon Plaintiff obtained a longer term work excuse from Dr. Sletten, Plaintiff told Dr. Elbers he felt much better. (*Id.* at 237.) Plaintiff's depression improved,

but then he said he could not work because he did not get along with people. (*Id.* at 262.) Plaintiff worked for the same employer for fourteen years leading up to his alleged disability onset. (Tr. 170.)

Overall, Dr. Sletten's treatment records and opinions do not establish that Plaintiff's mood disorder somehow worsened from the preceding years when he was able to work despite his impairments. For example, Dr. Sletten opined that Plaintiff had "totally persistent fears of people" (Tr. 296), but there is no explanation or even suggestion of how or when this came about, leaving open the question of how Plaintiff worked for fourteen years around people but suddenly, or even gradually, could no longer work in such an environment. Much of Dr. Sletten's opinion, that Plaintiff could persist at routine tasks without other people around, would have no difficulty performing repetitive tasks, and only moderate difficulty understanding and remembering instructions and responding appropriately to customary work pressure, is consistent with the ALJ's RFC finding. (*Id.* at 296, 460.) Although the evidence is capable of supporting more than one conclusion, it was reasonable for the ALJ to conclude that Plaintiff had long term mental impairments that had not precluded him from working in the past, and there was nothing in the record to explain why his impairments would have become disabling beginning May 21, 2007.

There is also evidence to support the ALJ's conclusion that Plaintiff's depression improved with counseling and medication while on short term disability. In September 2007, Plaintiff's depression was "much better" according to Dr. Elbers, and "slightly better" according to Dr. Sletten. (Tr. 237, 235.) Plaintiff reported on a number of occasions that Adderall calmed him and made his thinking clearer. (Tr. 276, 429, 436, 438, 443.) At the end of November 2007, Plaintiff denied anxiety, high stress, crying easily, or thoughts of

hurting himself.  (Tr. 232.)  Plaintiff rarely complained of medication side effects.

Plaintiff's depression was up and down in 2008 and 2009, usually associated with how well he was (or was not) getting along with his wife.  (Tr. 295, 429-30, 441-44, 435-39.) Dr. Sletten noted on a number of occasions that Plaintiff obsessed about his wife having an affair and continued to feel a lot of anger and distrust.  (Tr. 430, 436, 441, 442.)  Dr. Sletten recommended shock therapy to treat this particular problem.  (Tr. 442.)  Despite Plaintiff's reports of suicidal thoughts, again usually associated with his relationship with his wife, Dr. Sletten never believed Plaintiff would meet the criteria for involuntary hospitalization.  (*Id.* at 442-43.)  In December 2009, Plaintiff was feeling much better because he was getting along with his wife and working with a partner in a scrap metal business.  (*Id.* at 428.)  This, however, did not last.

When Plaintiff was interviewed by Dr. Warner, he described bouts of depression, forgetfulness and several incidents of anxiety in public places, such as a grocery store, but made little mention of not getting along with other people.  (Tr. 317-21.)  Dr. Warner saw no evidence of a personality disorder, which might be expected if someone could not tolerate even brief, superficial and infrequent contact with others.  (*Id.* at 320.)  Plaintiff's mental status examination suggested low average intelligence and intact recent and remote memory.  (*Id.*)  Contrary to Plaintiff's subjective complaints to Dr. Warner, none of Plaintiff's mental status examinations throughout the record suggested poor memory or concentration. (*Id.* at 233, 235, 237, 239, 243, 319, 353.)  Dr. Warner's evaluation and the mental status examinations are consistent with the ALJ's RFC finding.

For these reasons, and the reasons discussed below regarding the ALJ's credibility analysis, the Court finds substantial evidence supports the ALJ's decision to grant more

weight to Drs. Warner, Konke and Frederiksen's opinions, based on consistency with the record as a whole.  *See Wildman v. Astrue*, 596 F.3d 959, 969-70 (8th Cir. 2010) (affirming where ALJ properly considered and weighed available medical evidence but rejected treating and consulting physicians' opinions in determining claimant's RFC).

### 2. Obesity

Social Security Ruling ("SSR") 02-1p provides guidance on evaluating obesity within the disability framework.  SSR 02-1p, 2002 WL 34686281 (SSA Sept. 12, 2002).  The ruling recognizes that obesity may cause or contribute to depression.  *Id.* at \*3.  It provides, "[a]s with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations.  *Id.* at \*7.  Plaintiff contends that because he has a medically determinable impairment of obesity, the ALJ must consider how obesity affects his ability to work.  The ALJ did not reference obesity in his decision; therefore, Plaintiff asserts there is no way to know if the ALJ considered obesity.

Plaintiff canceled his consultative physical examination because he did not allege disability from any physical impairment.  (Tr. 338.)  Furthermore, he did not testify or otherwise allege that his depression or anxiety was exacerbated by obesity.  There is no evidence in the record linking obesity to his mental impairments in any way.  Under the circumstances, the ALJ's failure to discuss obesity in his decision is harmless.  *See McNamara v. Astrue*, 590 F.3d 607, 611-12 (8th Cir. 2010) ("Given that neither the medical record nor [Plaintiff's] testimony demonstrates that her obesity results in additional work-related limitations, it was not reversible error for the ALJ's opinion to omit specific discussion of obesity.")

### 3. Credibility Analysis

Analyzing the credibility of the claimant's subjective complaints is a component of the RFC determination. *Ellis v. Barnhart*, 392 F.3d 988, 995-96 (8th Cir. 2005). The ALJ may not discount a claimant's credibility solely because the objective evidence does not fully support his subjective complaints, but may discount credibility based on inconsistencies in the record as a whole. *Id.* at 996. The ALJ should address the following credibility factors: 1) daily activities; 2) duration, frequency and intensity of pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

Plaintiff asserts the evidence supports his subjective complaints because his mental status examinations consistently showed fatigue, sad or depressed mood and affect, tearfulness and suicidal ideations; and he was diagnosed with bipolar disorder, anxiety disorder and major depressive disorder. Plaintiff also contends the ALJ incorrectly found that he suffers no side effects from medication. Finally, Plaintiff asserts the ALJ did not consider the frequency of his subjective complaints or any aggravating factors.

Plaintiff's records did not consistently show fatigue, sad or depressed mood, tearfulness and suicidal ideation; these symptoms fluctuated in both their presence and severity. As discussed above, Plaintiff's depression improved from severe to moderate soon after he first saw Dr. Sletten, then fluctuated with the ups and downs in his relationship with his wife. On a number of occasions, Plaintiff reported feeling better or he specifically denied fatigue, crying easily or having suicidal thoughts. (Tr. 237, 259, 302, 444-45, 428-29, 352, 397, 232, 305.) It is true that Plaintiff expressed a desire to harm the man with whom his wife had an affair, but he never had any plan to do so and denied that he would ever carry out his desire. (*Id.* at 429, 431.) Dr. Sletten obviously believed Plaintiff would not hurt

30

himself or others, because he did not seek to have Plaintiff involuntarily hospitalized.

Plaintiff's statement that he would hurt himself to get SSD, and that he purposefully hurt his knee in 2004 and 2005 to get out of work is another negative credibility factor. (Tr. 303). After Plaintiff made this statement, he later reported to Dr. Sletten that he had taken a bunch of Seroquel and lithium and slept for three days. (Tr. 445.) Plaintiff did not receive emergency treatment nor did he seek treatment soon after this incident, but reported it to Dr. Sletten at a subsequent visit. Dr. Sletten did not try to have Plaintiff involuntarily hospitalized, which suggests he did not think Plaintiff was a danger to himself.

Plaintiff was diagnosed at different times with bipolar disorder, anxiety disorder, major depressive disorder and mood disorder. However, the mere existence of a medically documented impairment does not necessarily result in a finding of disability. *Stormo*, 377 F.3d at 807. As the *Polaski* factors suggest, the frequency, duration and severity of symptoms are important. The ALJ did not acknowledge any aggravating factor to Plaintiff's mood fluctuations, but he adopted most of Dr. Konke's RFC opinion; and Dr. Konke discussed the fact that Plaintiff's "major problem" was anger over his wife's affair. (Tr. at 338.) The ALJ considered that medication tempered Plaintiff's moods, and made him feel "easy-going" and calm. (*Id.* at 24-25.) Plaintiff repeatedly assured Dr. Sletten that Adderall kept him calm when he otherwise might "blow up." (*Id.* at 276, 429, 436, 438, 443.) Consistent with the ALJ's finding that Plaintiff did not suffer significant side effects from medication, Plaintiff only rarely complained of minor side effects such as dry mouth and a "weird" feeling. (*Id.* at 235, 241, 263.) Finally, the ALJ correctly noted that Plaintiff engaged in activities that were inconsistent with his allegation of extreme difficulty being around people and crowds, including enjoying a trip to the State Fair, enjoying two vacations,

helping neighbors and his brother, and starting a business with a partner. (*Id.* at 276, 430, 444, 445, 428.) In sum, the ALJ conducted a proper credibility analysis and gave sufficient reasons to find Plaintiff not fully credible. The ALJ did not completely discount Plaintiff's allegation that he could not work around people, the ALJ restricted Plaintiff to brief, infrequent, and superficial contact with co-workers and the public. This is consistent with the evidence in the record as a whole.

III.    CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT:**

1.    Plaintiff's Motion for Summary Judgment [Docket No. 10] be **DENIED**;

2.    Defendant's Motion for Summary Judgment [Docket No. 13] be **GRANTED;**

3.    If this Report and Recommendation is adopted, that judgment be entered accordingly.

Dated: October 25, 2012                    *s/ Arthur J. Boylan*
                                            ARTHUR J. BOYLAN
                                            United States Chief Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or

judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before November 8, 2012.